Gumbel & Co. vs. Beer et als.

## No. 9177.

S. GUMBEL & CO. VS. FERDINAND BEER ET. ALS.—A. LIONNET ET AL. INTERVENORS.

An *affidavit* that the petitioner has sold cotton, the price of which is unpaid and on which there exists a lien, and that the purchaser is about to convert the cotton. thus sold. into money or evidence of debt, with intent to place it beyond the reach of his creditors. is amply sufficient to authorize a writ of sequestration, which will be maintained, if executed within five days after the delivery of the cotton.

The privilege of a vendor of agricultural products of the United States, in New Orleans. exists during five days from the date of delivery, whether the commodity be in the possession of the purchaser or of third parties, where the price of sale is unpaid. Such privilege will be recognized and enforced, where the commodity is seized within that time.

A vendor of such product who issues to the purchaser, an order of delivery addressed to the press where the same is stored, is not estopped from claiming such lien, where the order does not explicitly say that the product is to be delivered *without* vendor's privilege.

It is immaterial by what title the third person holds the commodity, whether by sale, or pledge or otherwise, as, in any case, the ownership or possession passes to him *cum onere*, subject to the vendor's lien which affects the commodity, during five days, without registry, from the date of delivery by the owner to his vendee.

The lien exists whether the property was sold for cash or on credit.

Article 3227 of the R. C. C., as practically amended by the Acts of 1854 and 1855, is an entirety. the latter legislation extending the privilege to cases in which the property is in the hands of third persons, the provision in the first paragraph of the article notwithstanding.

The lien or privilege exists in such cases, provided the vendor has not waived it and provided the product has not been validly pledged on the faith of a warehouse or similar receipt, or bill of lading, issued in strict compliance with the law as embodied in the statutes: No. 150 of 1868 and No. 72 of 1876, which do not clash with or repeal the Acts of 1854 and 1855 and article 3227 of the *Revised Civil Code*.

Rulings of this court in 7 A. 371; 13 A. 528; 24 A. 363; 25 A. 82; 26 A. 6: 29 A. 186; reviewed and explained.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot*, J.

*Thos. J. Cooley* and *Leovy & Kruttschnitt* for Plaintiffs and Appellees.

*E. D. White* for Intervenors and Appellants.

*Henry Renshaw* and *Miller & Finney* for Intervenors and Appellants.

The opinion of the Court was delivered by

BERMUDEZ, C. J. This is an action to recover, with lien, the price of cotton, attached and sequestered within five days after the day of sale, in the hands of third persons who, by intervention and answer, assert adverse title thereto.

There was judgment against F. Beer, the purchaser, condemning him to pay the unpaid price, $8690 62, recognizing the lien on the cotton

seized and rejecting the interventions, intervenors being held to return the cotton which they had bonded and in default to pay : the one $6654 88, the other $2035 74, with interest and costs.

The intervenors alone appeal.

The contention is : that the seizure of the cotton was illegal, because of the insufficiency of the *affidavits* made to obtain the writs under which it was effected; that the plaintiffs are estopped from questioning the ownership of Lionnet to the cotton; that the original law of 1854, securing the five days' lien in favor of vendors of agricultural products, has been, if not repealed, at least modified, so as not to apply to cash sales and to cases where the vendor, although unpaid, has parted with possession of the cotton, which was subsequently pledged or transferred by the purchaser, in favor of or to innocent parties, who have acquired rights for valuable consideration.

I.

Much has been said and written to show the insufficiency of the *affidavits* made to obtain the writs of attachment and sequestration, under which the cotton sold by plaintiffs to Beer, was seized within five days after the sale.

The pith of the charges is : that the *affidavits* are insufficient, the first, *in toto* on its face; the second, because taken by the creditor *himself*, who swore to the allegations of the second petition as true, " *to the best of his knowledge and belief*," which is permissible only when the oath is taken by the agent.

The plaintiffs contend that the intervenors have no right to show any irregularity in the suit, for the sole purpose of rescuing their property, as, whether the plaintiffs, the court and the sheriff have been acting legally or not, is none of their business.

It must be noted that the intervenors had been made defendants in the suit by supplemental petition.

Conceding that the intervenors, either as such, or as defendants, or in both capacities which are practically one and the same, have a right to seek the dissolution of the writs and thus release the property seized in their possession, it by no means follows that the ground upon which they rely is well taken.

The first *affidavit* made to obtain the attachment and sequestration against Beer cannot be successfully attacked, as insufficient to procure the writs which were issued and executed within five days from the sale.

It is a decided mistake to assume that, because neither the petition nor the *affidavit* contains the averment that the affiant fears that the

defendant will conceal, part with, or dispose of the movable property in his possession, during the pendency of the suit, the cotton was illegally seized and, therefore, should be released.

Were this position well taken the suit would here end as to the intervenors.

The law which authorizes a sequestration under the state of facts expressed in those terms, is paragraph 8 of article C.P. 275, but it does not prescribe that the writ shall issue *only* in such cases.

The article provides explicitly that a sequestration may be ordered in the following cases—stating them, eight in number, the seventh of which is: that a plaintiff may obtain a sequestration in all cases where he has a lien or privilege upon property or complying with the requisites provided by law.

The next, article 276, simply declares that the plaintiff, wishing to obtain the order in any one of the cases, must annex an *affidavit* setting forth *the cause* for which he claims such order and his obligation, etc.

Paragraph 8 is section 6 of the Act of 1839, No. 53, p. 163, which was passed to amend article 275 of the C. P. and which distinctly does so by providing: "*that in addition to the cases therein mentioned*, a sequestration may be ordered," etc. It was, therefore, an additional or supplemental legislation which did not repeal previous laws.

A reading of the remaining six paragraphs show in what other cases the writ can issue. Each paragraph announces what the circumstances are to be in each case, which will justify the granting of the remedy

In the case mentioned in paragraph 7, the creditor must swear to the existence of the debt, of the privilege on the property, and must state the circumstances which imperil the loss of the lien.

In Selleck vs. Kelly, 11 R. 15, the affidavit made to obtain the sequestration merely stated the debt and the lien and the court properly held that this was not sufficient, that the affiant should have set forth *the cause* for which the order was claimed.

Neither are the words to be used sacramental. It is sufficient, if from the words used, it appears that there exists a danger for the loss of the lien, namely: that the property will be illegally disposed of by the defendant. Dumonteil vs. Dubroqua, 1 R. 531.

It has likewise been held that the omission to use the words "during the pendency of the suit" is not fatal. Wells vs. St. Didier, 1 A. 119.

Now, by reference to the original petition, it is apparent that Lengsfield unequivocally swore not only to the existence of the debt and of the vendors lien, but also to the apprehended fraudulent conversion of

the cotton by the defendant, into money or evidences of debt, with intent to place it beyond reach.

It seems to be conceded that had the *affidavit* set forth the fear of a removal of the cotton, it would have followed the exigencies of the law.

There is no law which requires that the *affidavit* shall aver, in a case like the present, this or that. The law demands that a cause, a sufficient cause, be alleged. That the debtor is about to convert the cotton into money, to defraud his creditors, is surely good cause for the apprehension of the loss of the privilege. It is not only an equivalent but a broader averment than the allegation of removal. Property removed can be more easily reached by the executive officer of the law, than the proceeds thereof in the debtor's pocket. Closely analyzed, it implies the essentials of even paragraph 8, which authorizes the writ when the party in possession is about to part with or dispose of the property.

Because the averment made in this case is such as can justify an attachment is no reason why it should not serve also for a sequestration, if it is, in itself, otherwise sufficient. The affidavit to the first petition was designed to procure the two writs which are not antagonistical or exclusive the one of the other. An attachment may issue as well when there exists a lien, as when there exists none. A sequestration always issues when a right to or on property is averred and there is danger of losing it.

The concurrence of the averments made was ample authority for the issuance of the writs.

The lien claimed is that resulting from the sale of the cotton, the price remaining unpaid and the seizure having taken place within the five days. It is not a lien resulting from the seizure by attachment.

The second *affidavit* was made at the foot of the supplemental petition and contains the averments, announced in paragraph 8 of the article, setting forth that the facts are true "to the best knowledge and belief" of affiant. It is signed by W. H. Lengfield, a member of the firm.

It was superfluous, in order to give validity to the seizure, under the first writs and to bring in Lionnet and Lehman, Abraham & Co., who were not indispensable, but merely proper parties and who, after the writs had issued and been executed, intervened, assuming the attitude of defendants in possession.

Had it not been made at all, its absence could not have prejudiced the validity of the seizures previously effected under the two writs.

This view of the matter renders it unnecessary to consider the attacks levelled at the insufficiency of the second *affidavit* taken by one of the partners " to the best of his knowledge and belief."

## II.

It is next contended that plaintiffs are, as to Lionnet, estopped from contesting his title to the 124 bales seized in his control, which he claims to have acquired from Beer, the absconding debtor.

The matter of fact is that, on the 2d of May, Lionnet's agent (Meilleur) went with Beer to plaintiffs' office, acting for Lionnet, and called for the delivery of the cotton, informing Gumbel that the cotton had been sold to a friend, meaning Lionnet, that Gumbel said that he would have the delivery order made out; that the order was drawn up and handed to Beer who endorsed it to Lionnet, who, with it, obtained, on the same day, delivery from the press.

The delivery order does *not* declare that the cotton is to be delivered *without* the vendor's privilege.

There is no dispute that the cotton had been sold by plaintiffs to Beer on the 2d, and that, when the order of delivery was issued, it had not passed the scales, which it did on the following day only.

It is clear that on the 2d, when the delivery order was made out and handed to Beer, and endorsed over by him to Lionnet, the plaintiffs had a lien on it for the payment of the unpaid price. It affected it as effectually as a vendor's privilege encumbers real estate, when it is duly recorded.

Previous to the present Constitution, it had been established that privileges on even movable property would not affect third persons unless upon proper and valid registry. Not so now. The privilege exists without registry. It is true that the Constitution authorizes legislation on that matter, but as yet none has been provided for. Const. 177.

The Act of 1854, p. 45, the object of which was "to protect merchants or vendors of agricultural products in the city of New Orleans," was re-enacted in 1855, p. 363, under the title of "An Act relative to privileges," and now forms part of the Revised Civil Code of 1870, as Article 3227. It provides as follows:

"Any person who may sell the agricultural products of the United States in the city of New Orleans, shall be entitled to a special lien and privilege thereon to secure the payment of the purchase money for and during the space of five days only after the day of delivery, within which time the vendor shall be entitled to seize the same, in whatsoever hands or place they may be found, and his claim for the purchase money shall have preference over all others. If the vendor give a written order for the delivery of any such product and shall say therein

that they are to be delivered without vendor's privilege, then no lien shall attach thereto."

The testimony received to establish what passed at the time the delivery order was issued and handed to Beer, fails to show that plaintiffs said any thing from which it can be inferred that they intended to forego and had waived their lien on the cotton. The silence of the delivery order on that subject amounts to demonstration that the privilege was retained, the converse of the proposition, negativing the words of the statute, being: "*If the vendor gives a written order for the delivery of any such products and does not say therein that they are to be delivered without vendor's privilege, then the lien shall attach thereto.*"

The vendor's lien attaches to the thing, *adheret visceribus rei*, until formally abandoned or extinguished in some legal mode. 4 A. 313; 32 A. 829; 34 A. 164.

The plaintiffs, far from having made any representation or done any thing inducing any one to assume and believe that they had relinquished their privilege for payment of the unpaid price due them, have done a legal act from which the intervenor should have deduced that the lien had been retained. It was his interest, his duty for self-protection, to have inquired from the plaintiffs whether the price had or not been paid. For not having done that which he should have done, so as to protect himself and avert possible injury, he has none to blame but himself.

### III.

The evidence, ON THE MERITS, discloses the following salient facts:

On May 2, 1882, the plaintiffs sold to F. Beer 161 bales of cotton at 11⅞ cents per pound, for the delivery of which they issued to him an order on the press, without saying therein that they were to be turned over to him without vendor's lien. With that order, he obtained possession of the cotton on the following day. There is no pretense that the price was ever paid.

It appears that, previous to his purchase of this cotton from plaintiffs, Beer had obtained from Lionnet an advance of money, in consideration of which he was to deliver to them 200 bales of cotton, which were not at the time, at least to the extent of 124 bales, in his possession or control; that it is only *after* the delivery of the cotton sold him by plaintiffs, that he turned over to Lionnet the 124 bales, the ownership of which the latter claims to have acquired by *purchase*. He does not assert that it became his by a *dation en paiement*, or other-

wise. His averment is, that Beer sold and that he, Lionnet, purchased the cotton.

Surely, there was no sale and consequently no purchase, and the cotton never ceased to be Beer's, or if it ceased to belong to him, it passed to Lionnet *cum onere.*

Three things must concur for the perfection of the contract: The thing sold, the price and the consent. R. C. C. 2439.

At the date of the latest advance of money, May, 1, 1882, when a check of $9000 was given Beer by Lionnet, as an advance, Beer did not have and did not own the cotton which he bought from plaintiffs on the 2d. There was then no thing in existence, between Beer and Lionnet, which could have been then sold, by the former and bought by the latter. It would have been the sale of the property of another, which the law declares to be a nullity. R. C. C. 2452.

There was no price fixed and determined for the cotton, which is sold according to grade, and by the weight. The law declares that the price of the sale must be certain, that is to say, fixed and determined by the parties. R. C. C. 2464.

Had the cotton in question, sold by plaintiffs to Beer on the second of May, been destroyed before passing the scales and delivery, which took place on the third, the loss would not have fallen on Lionnet. The subsequent weighing and delivery of the cotton by Beer to Lionnet, could not and did not impress upon the transaction the character of a sale. It would only be viewed at best, either as a collateral security, pledge, or as a *dation en paiement;* but if either, the intervenor could not claim, as pledgee, or as owner, under the last mode of transfer, for he has neither alleged, nor proved, nor even argued accordingly. The irresistible inference is, therefore, that, if the ownership of the cotton did not pass from Beer to Lionnet, it continued to dwell in the former and that the cotton in question, under the latter's control, was there, for account and in the constructive possession of Beer. But if it were true that by the transfer of the cotton by Beer to Lionnet, title of ownership was conveyed and acquired, the dominant question would remain to be considered, whether it passed or not *cum onere,* that is, subject to the vendor's privilege asserted by the plaintiffs.

It is generally considered by the bar and the bench, that the decision in 1852, in the case of Campbell et al. vs. Penn, etc., 7 A. 371, which threatened the destruction of agricultural industry, in this State, was the cause which prompted the adoption, in 1854, of the act of that year, p. 45, the text of which is hereinbefore given.

In 1858, four years later, in a contest arisen between the vendor, sequestering cotton within the five days following the delivery, and sold for cash, but unpaid, and a third party who had made advances thereon; this Court held : That the vendor was entitled "to the first or superior privilege and is thereby entitled to be paid by preference to the other." Miltenberger vs. Hetch—Aldrech, intervenor, 13 A. 528.

The principle thus recognized and laid down, was subsequently admitted and enforced in the case of Tyree vs. Sand—Miller, intervenor, 24 A. 363, in which the court enforced here, a vendor's lien existing in Alabama, between parties, citizens of that State, its law being identical with ours on the subject. Referring to the case in 13 A., the Court said that the intervenors, bankers of Mobile, knew the law and were aware of the possibility of plaintiffs lien. " They might have easily asked if the cotton was paid for, they might have required their money to be used in payment of it. It is as likely as not that they knew it was not paid for." The judgment recognizing the plaintiff's lien as vendors was affirmed and the intervention rejected.

It is not correct to say that the ruling first made, was subsequent repudiated by two decisions of the then Supreme Court of this State, found in 25 A. 82, and in 26 A. 6.

In the first case, the Court decided that the sixth section of the act of 1868, p. 168, concerning the transfer of bills of lading and the effects of that transfer, is only a legislative sanction given to the commercial law of universal application, by which it is held, that a bill of lading, legally transferred, gives title to the property which it represents and that the section does not clash with the act of 1855, incorporated in the Revised Code, as Article 3227. It is true that, in the body of the opinion, which was that of a majority, the Justice who was the organ of the Court says, that the article does not give the privilege, where the sale is made for cash and where the commodity has ceased to be in the possession of the purchaser, but it does not appear that the last portion of the article was considered. The two other parties who concurred, placed their concurrence in the decree on the ground that there had been no registry. So that what was first said, may be considered as in superabundance, as *obiter*. Even then, that opinion, under such circumstances, cannot have produced the effect of overruling anterior expositions of the law on the subject.

Neither can the other decision in the second case be invoked for that purpose. Two judges only concurred on the point, two on the ground of the want of registry as in the first case, while the fifth one, dis-

sented in *toto* on both the facts and the law. In both, the prominent issue in the conflict, was between the holder of a bill, and a vendor, which does not arise in this case, in which the contention exists between the vendor and one who holds from a purchaser, to whom a delivery order was issued, to the knowledge of the claimant, to the vendee, without waiving the vendor's privilege, where that claimant cannot be considered and dealt with as an innocent third party without notice.

A patient and careful consideration of the two acts of 1868, p. 193, No. 150, and of 1876, p. 113, No. 72, satisfies us that neither was designed to repeal the acts of 1854 and 1855, as now embodied in the Revised Code as Article 3227. The object of the former act, as its title indicates, was to prevent the issue of false receipts, or bills of lading, and to punish fraudulent transfers of property by cotton presses, wharfingers and others.

The purpose of the latter, as announced in its title, was to govern the manner in which cotton press and similar receipts should be issued and the delivery and disposal of the property for which such receipts may be issued.

It is true that, by section five of that last act, while "the vendor's lien of five days privilege now allowed in commercial transactions, for the payment of the purchase price," is formally recognized, and is declared as "not to be affected by the provisions of this act," there is stipulation that it shall not prevail "in case a warehouse receipt has been pledged as collateral, for money borrowed; * * * *provided*, that when the ʞ * * pledgee may have wrongfully pledged, in violation of this act, any property, the lien of the owner shall be valid even against the third holder of the warehouse receipt."

The guarded language used is manifestly expressive of the unwillingness of the law-giver in any way (except in that specially mentioned which does not arise in this controversy) to impair, alter or abridge the lien previously conceded in favor of merchants and vendors of agricultural products of the United States. Besides, it may be a matter of inquiry how far the derogation, however exceptional, may be deemed expressed in the title of the law.

It may be worthy of note that, in the Chaffraix case, 29 A. A. 186, while the court intimated that the vendors could have no recourse for the price but on their vendees, to whom they sold for cash, and of their own accord waived rigid compliance by the vendees with the conditions of the sale, it is a fact that the privilege claimed had not been

secured by a registry and that one of the justices, *Spencer*, J. perhaps unnecessarily, but actually, expressed the opinion that the five day lien law was still in force.

In the present instance, it may well be contended that the cotton was not sold for cash, which means payment on delivery, for it is apparent that the litigants are all members of the Cotton Exchange in this city and that they dealt with each other under the influence of the rules prescribed in that institution and which have become rules of usage and custom, which prevail in such cases and which they no doubt intended to and did observe.

But were it otherwise, it is clear, even under the most rigorous interpretation and application of the law, that whether the ownership passed or not from Beer to Lionnet, the plaintiffs' lien would still attach, for in the first case, it would have done so *cum onere*, and in the second, it would have simply followed Beer's property in the hands of the possessor thereof.

It is apparent that, as it stood formerly, the law as found in Art. 3194 of the Code of 1825, now Art. 3227 of the R. C., allowed a privilege to the vendor on movables sold by him for cash or on credit over other creditors of the purchaser if the property remained in the possession of the latter; but in 1854, the Legislature, for reasons of public interest, however, thought it just and necessary to formulate an exception and to permit the assertion and enforcement of the privilege on agricultural products of the United States sold in New Orleans for the term of five days from delivery, in *whatsoever hands* or place they might be found.

The incorporation of the Act of 1854 (p. 45) into the R. C. as part of the old Article 3194, now 3227, amounts to demonstration that the general rule laid down in the first paragraph, which restricted the privilege to the case where the property had continued in the possession of the vendee, was, from the beginning, modified so as to extend the exercise of the privilege on such agricultural products, in whatsoever hands found, within five days of the date of delivery, whatever the terms of sale were, where the price was unpaid and the vendor had not voluntarily and formally relinquished it.

So that the third paragraph of the article can be read: Any person who may sell the agricultural products of the United States in the city of New Orleans shall, (*nevertheless*) be entitled to a special lien, etc. The two laws should be construed so as to be made to work harmoniously. Durand vs. Dubuclet, 24 A. 155.

The effect of the Act of 1854 on Article 3194 has *ab initio* been in that sense, but its spirit and purpose are made manifest by the reasoned insertion.

Our conception of the entire legislation and of the jurisprudence is, therefore, that the vendor of agricultural products of the United States sold in New Orleans, have a lien on the commodity sold for the payment of the unpaid price, whether the sale was made for cash or on credit, and is entitled to enforce it by seizure of the identical article, either in the possession of the vendor or in the hands of third parties, within five days after the delivery thereof, *provided* he has not waived it and perhaps provided the same has not been validly pledged on the faith of a properly issued warehouse or similar receipt, or bill of lading.

Touching the intervention of Lehman, Abraham & Co., it suffices to say that it presents substantially features kindred to those in the cases of Allen, Nugent & Co. vs. Buisson, 35 A. 109, and of Bourg vs. Lopez, 36 A. 439; and that, even if these intervenors claimed title of ownership and had really acquired by purchase or otherwise, they would have no better ground to stand upon than that upon which Lionnet has contended, but in vain.

The plaintiffs having their lien and the intervenors knowing the law and having it in their power to ascertain the facts, the latter cannot be listened to invoke the rule that "as between two innocent parties the loss should fall on the one whose imprudent confidence has enabled the wrong-doer to get credit."

In considerate, elaborate and well expressed reasons, the district judge has reached the same conclusions.

Judgment affirmed, with costs.

Justices Todd and Fenner dissent as to the ruling on the validity of the sequestration, but concur on the merits.

---

### DISSENTING OPINION.

FENNER, J. As conceded in the majority opinion, the essential foundation of the relief sought, so far as Lionnet and Lehman, Abraham & Co. are concerned, is the sequestration.

It is elementary that the mere existence of a lien or privilege is not, of itself and by itself, sufficient to entitle a party to a sequestration.

He must not only have the privilege, but must in addition, as stated in Paragraph 7 of C. P. 275: "Comply with the requisites provided by law," and those requisites have been consistently held to include an affidavit to some of the causes provided in the article establishing the

peril of the privilege and the necessity of the writ in order to preserve it. Sellick vs. Kelly, 11 Rob. 157; Wilson vs. Churchman, 4 A. 456; Blanc vs. Wallace, 26 A. 492.

So far as the first writ of sequestration is concerned, the affidavit is entirely lacking in any of the "requisites provided by law," as set forth in the articles touching sequestration, except the mere existence of the privilege.

I have been unable to satisfy my mind that the insufficiency of this affidavit can be eked out by the fact that, in the same petition, the plaintiff applied for a writ of attachment also, and made an affidavit under C. P. 243, to the effect that the debtor "had converted or was about to convert his property into cash money, or evidences of indebtedness, with intent to place it beyond the reach of his creditors." This form of affidavit is provided exclusively for attachments and is applicable to that writ alone, and not to sequestrations. In such matters there is no room for the doctrine of equivalents or for the translation of the requisites of one writ to support another. Nor does the equivalency claimed exist. Whatever effect the conversion into money or evidences of debt might have in placing the property beyond the reach of other creditors, it could have no effect to defeat or imperil plaintiff's privilege. The affidavit is thus radically deficient. It charged no intent to remove the property out of the State, or to conceal it, or to do any act mentioned in Art. 275, or calculated to deprive him of the benefit of his privilege.

Indeed, the learned counsel for plaintiff did not attempt to support the first writ of sequestration, and I am satisfied the application for the second writ was a recognition of the invalidity of the first, and a virtual abandonment of it.

As to the second writ, the objection that the affidavit therefor was made by a member of the plaintiff firm, "to the best of his knowledge and belief," is, in my opinion, fatal.

However absurd or unreasonable be the conditions imposed by the Legislature for the obtaining of these conservatory writs, our jurisprudence is uniform that, when imposed, they must be rigidly complied with.

The Legislature has seen fit to make a clear distinction between the affidavit made by a party and that made by an agent. In the latter case, it permits the affidavit to be made "to the best of his knowledge and belief;" in the former, it permits no such qualification.

If such distinction had not been made, I should readily concur with those opinions which this Court has rendered concerning affidavits

for injunction, as to which the Legislature has not made such distinction, and where it has held that the affidavits in either form are equivalents.

But as, with reference to other conservatory writs, the distinction has been made, we must conform to and enforce it.

I only follow the principle firmly established by our predecessors in the following quotation: "Sequestrations and other conservatory remedies by which the property of a party is wrested from his possession and taken into the custody of the law, before judgment, without notice and upon the *ex parte* showing of the plaintiff, are extraordinary and rigorous, and hence the doctrine has been uniform that they are to be strictly construed and that the requisites of the law must be observed on pain of nullity." Wilson vs. Churchman, 4 A. 456.

So far as the writ of attachment is concerned, conceding that it continued in force, it is not given as a means of enforcing privileges; nor, under the facts disclosed in this case, could the attachment be sustained for a moment, since it conclusively appears that the plaintiff's debtor had parted with the property before the writ issued. We have held that attachment does not lie in such case, but that the revocatory action must be resorted to. Redwitz vs. Waggaman, 33 A. 26.

Nor, regarded in the light of a mere revocatory action, has the suit of plaintiff any foundation, since whatever fraud is brought home to Beer, the skirts of Lionnet and Lehman, Abraham & Co., are entirely clear from the least complicity therein.

I, therefore, dissent.

Todd, J., concurs in this opinion.

Rehearing refused.